UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL INDICTMENT |
| | ) | |
| Plaintiff, | ) | 2:10-CR-578 – PMP- RJJ |
| | ) | |
| v. | ) | VIOLATIONS: |
| | ) | |
| LINDA LIVOLSI, | ) | 18 U.S.C. § 1349 – Conspiracy to |
| a/k/a Linda Grogg, | ) | Commit Wire Fraud |
| | ) | |
| Defendant. | ) | 18 U.S.C. § 1343 – Wire Fraud |

### DEFENDANT'S MOTION TO TRANSFER CASE FOR TRIAL

Respectfully submitted, Scott. A. Graham, Esq., (*Pro Hac Vice*; OK Bar No. 19817, Graham, Allen & Brown, PLLC., 427 S. Boston Ave., Ste. 355, Tulsa, Oklahoma 74103, Tele: 918-948-6171, Fax: 800-460-3446, scott@lawtulsa.com, Attorney for Defendant Livolsi.

DEFENDANT Linda Livolsi ("Livolsi"), by and through her undersigned counsel, hereby mores this Court, pursuant to Fed. R. Crim. P. 21(b), for an order transferring all counts in the above-styled case to the Northern District of Oklahoma for the convenience of the parties and in the interests of justice.[1]

### I. INTRODUCTION & BACKGROUND

Linda Livolsi was born on July 11, 1968 in Lynwood, California. She later moved to Oklahoma where she graduated from high school and continued her education by earning a degree at the University of Oklahoma. In 1996, she founded RGM Enterprises LLC, which is a financial consulting and private wealth management firm registered in the state of Nevada. Mrs.

1

Livolsi was the president of this company from the time of its inception until she formally resigned in February 2011 after being forced to take a leave of absence for medical reasons the year before.

In December 2010, Mrs. Livolsi was indicted on charges of conspiracy to commit wire fraud and wire fraud involving a transfer of funds on December 4, 2007. The charges stemmed from a transfer initiated by Denise and Elwood Bartlett using their MECU Credit Union account located in Maryland. The transferee was RGM Enterprises LLC at Wachovia Bank in Paoli, Pennsylvania. The transaction took place at the Ritz Carlton Hotel in Marina Del Ray, California, where Mrs. Livolsi and Mr. Bartlett were visiting in order to attend the Grammy Awards.

In September 2005, Livolsi was diagnosed with the chronic autoimmune condition known as Lupus. Then in 2010, she was diagnosed with both leukemia and tumorous growths on her thryroid. She underwent chemotherapy for the leukemia. While the leukemia is currently in remission, the chemotherapy caused severe aggravation of her lupus condition, that has led to a persistently painful and debilitating effect on her life and mobility that will continue for the foreseeable future. Because of the pain of the condition and the amount of pain medication necessary to make daily life bearable, Mrs. Livolsi can no longer participate in activities she once enjoyed, including cooking, driving, and enjoying the outdoors.

Mrs. Livolsi's was thyroid condition also persists. She is scheduled to receive radiation therapy in August 2012, in an attempt to kill her thyroid and several growths around it. The procedures involves her drinking several courses of radioactive fluid. The fluid will contain the maximum amount of radioactive material permitted for her condition and will require her to be

medically quarantined for several days after each treatment to prevent exposing others to the radiation emitted from her body.

Additionally, in May of this year, doctors discovered many small tumors in Mrs. Livolsi's lungs after investigating her repeated coughing of blood. While tests have yet to determine whether the tumors are malignant, she has been diagnosed with chronic bronchitis as a result of the same symptoms that led to the tumors' discovery. Mrs. Livolsi's doctors have scheduled additional tests in August and September to attempt to diagnose and treat the tumors.

In the meantime, Mrs. Livolsi's monthly schedule revolves around appointments, procedures, tests, and check-ups relating to her various health complications resulting from both her ailments and the dramatic treatments they require. Her daily medication list contains at least twenty (20) medications, and she can only stay awake and focused for between twenty minutes and an hour at a time. She is also not able to move freely, requiring the constant assistance of her husband and children throughout the day. Her family essentially functions as Mrs. Livolsi's at-home care; they must assist her with standing, walking, showering and dressing, getting meals prepared, keeping hydrated, using the restroom, and flushing the medical port attached to her body that is used to take blood and receive medicines.

## II. VENUE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF OKLAHOMA

A.  *Introduction*

Federal Rule of Criminal Procedure 21(b), in conjunction with 18 U.S.C. § 3237(a), gives the Court discretion to change the venue of an action "in the interest of justice" and for the

convenience of the parties and witnesses. *United States v. McDonald* 740 F. Supp. 757, 762 (D. AK 1990). Although there is a general presumption that a criminal prosecution should proceed in the district it is first filed, it has long been recognized that "[q]estions of venue in criminal cases . . . are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed." *United States v. Aronoff*, 463 F. Supp 454 (1978) (Quoting Justice Frankfurter's opinion in *United States v. Johnson*, 323 U.S. 273, 276 (1944)). Accordingly, federal trial courts have uniformly agreed that upon a defendant's motion for venue transfer pursuant to rule 21(b) they are to employ a balancing test established by the U.S. Supreme Court in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243-44 (1964) to consider whether claims should be transferred to another valid forum "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). That standard governs here.

The *Platt* test is used by trial courts after they determine the transferee court is a valid and appropriate venue under the applicable criminal venue statute. *Id.* at 241. If the proposed transferee venue meets that threshold, then the court is directed to consider the applicability and degree of weight to give to the following ten factors:

1. Location of the parties;
2. Location of possible witnesses;
3. Location of events likely to be at issue;
4. Location of pertinent documents;
5. Disruption of defendant's business by a failure to transfer;
6. Expenses parties will incur in each venue;
7. Location of counsel;

      8. Relative accessibility of the forum;

      9. Docket burden in either district; and

      10. Any "special elements" that might affect the transfer.

*Id*. at 243-44. In balancing these factors, the legal standard adhered to by courts has typically been "focus on balancing convenience and hardship to the parties." *McDonald*, 740 F. Supp. at 762. Furthermore, "[t]he primary concern of Rule 21(b) is to 'minimize the inconvenience to the defense.'" *Id.* (quoting 2 C. Wright, *Federal Practice and Procedure,* Criminal 2d § 343, at 260 (1982) and citing the Fed. R. Crim P. 21(b) advisory committee's notes).

B.    *This Case Might Have Been Brought in the Northern District of Oklahoma.*

      According to 18 U.S.C. § 3237(a), "any offense against the United States . . . committed in more than one district, may be inquired of and prosecuted in *any district in which such offense was begun, continued, or completed*." (emphasis added). Neither of the two counts alleged against Mrs. Livolsi in the Indictment (dkt. #1) are alleged to have been committed during her physical presence in Nevada. Indeed, her residence and primary business location where, at all pertinent times, in Tulsa, Oklahoma, in the Northern District of Oklahoma. Consequently, at the very least, the knowledge or intent to commit the alleged acts would necessarily have either been "begun, continued, or completed" in the Northern District of Oklahoma. Furthermore, any act—where its affects may have been felt—was caused, set into motion or materially furthered during her presence in a given forum can be said to have "begun" or "continued" in that forum. Thus, venue plainly exists in the Northern District of Oklahoma for both counts in the Indictment, satisfying the threshold burden for transfer of venue. *See United States v. Miller*, 111 F.3d 747, 753 n. 8 (10th Cir. 1997).

    C.    The *Platt Factors Support Transferring This Case to the Northern District of Oklahoma*

When each of the *Platt* factors below are analyzed in relation to the circumstances of this case, the merits of a transfer to the North District of Oklahoma overwhelm any factors weighing against it.

1. *Inconvenience to the parties.*

The sole defendant in this case is Mrs. Linda Livolsi, a resident of Tulsa Oklahoma. (The corporate entity, for which she worked, RGM Enterprises, LLC, is not a party.) Although the specifics of the *Platt* decision dealt with a corporate defendant, subsequent cases have consistently applied the "inconvenience to the parties" factor to natural persons and corporate entities in precisely the same way; thus it applies to Mrs. Livolsi in the instant case. *See e.g.,, McDonald*, 740 F. Supp at 762.

In this case, the convenience factor from *Platt* clearly favors trial in the Northern District of Oklahoma. Mrs. Livolsi is domiciled in Tulsa, Oklahoma, and has long received life-sustaining care there for cancer, lupus and a host of related ailments. Nevada, the current forum, is over a thousand miles from her home, her doctors, and her family, who are her only day-to-day caregivers; it would be tremendously—possibly tragically—disruptive to her care and well being if the case were to be tried so far from her home.

Although Rule 21(b) urges the courts to give due consideration to the possible inconvenience to the government as a party, the factor has typically been given little weight in the face of other factors militating in favor of a transfer. *Id.*; s*ee also U.S. v. Gruberg*, 493 F. Supp. 234, 242-243 (S.D.N.Y. 1979).

Finally, because Mrs. Livolsi is the sole defendant on both counts, this transfer would not sever claims or parties it is not subject to the typical disfavor associated with burdening the government with any unnecessary duplication of time and effort in multiple forums. *See United States v. Testa*, 548 F.2d 847, 856 (9th Cir. 1977).

2. *Locations of possible witnesses.*

The most significant witness for the government, Mr. Bartlett, lives not in Nevada, nor even in the 9th Circuit, but in Maryland. Another key witness for the government, Ms. Amy Justice, also resides outside of the current forum.

The many character witness Mrs. Livolsi would call at trial reside in or immediately near the Northern District of Oklahoma. Although it is true that the sheer number of witnesses a defendant asserts are near to the transferee forum is not conclusive to the determination of a transfer, it often strongly weighs in favor of transfer. *See McDonald*, 740 F.Supp. at 762.

3. *Location of events likely to be at issue.*

Insofar as this is a wire fraud action, it is unlikely that any particular location related to the forum is of particular importance to the proceeding. Neither Mrs. Livolsi, nor the government's presumptive primary witnesses were in Nevada, either separately or together during the time concerned in this case, it is hard to see how Nevada could be an essential forum for the trial on such claims.

4. *Location of pertinent documents and records likely to be involved.*

All of Mrs. Livolsi's own business records and other documents are maintained in the transferee forum. While some documents related to RGM Enterprises might be housed in Nevada, the modern age makes it relatively easy for documents to be transferred and stored electronically, and thus available in whatever forum they are needed. Assuming such documents

are not already in electronic format, it would impose a comparatively lighter burden on the government for them to be converted than it would for Mrs. Livolsi to have to travel to the documents.

5. *Expenses to the parties.*

The U.S. Attorney's office in the Northern District of Oklahoma is approximately two blocks from the federal courthouse in Tulsa—walking distance for any marginally able-bodied federal prosecutor. Furthermore, the areas surrounding the downtown area boast several well known hotel chains, are easily and safely walkable and nearly devoid of traffic congestion. Furthermore, as noted in *McDonald*, "it is the custom for various offices of the United States Attorneys to accommodate visiting prosecutors; therefore it is unlikely any additional expense to the government will a major factor." 740 F. Supp. at 763. Naturally, Mrs. Livolsi and her counsel can not similarly avail themselves of any such readily available space in Las Vegas. Thus, the factor supports transfer of the instant case.

6. *Location of counsel.*

Regarding a defendant's right to choose his or her counsel, Courts have found "the defendant's choice of person in whom [she] entrusts [her] criminal defense is entitled to some weight" and should not be cavalierly dismissed. *Aronoff,* 463 F. Supp. at 459. Mrs. Livolsi's primary counsel resides and offices in Tulsa, Oklahoma. The firm's proximity to Mrs. Livolsi, to defense's witnesses and ready access to evidence in and around the Tulsa area makes trying this case in the Northern District of Oklahoma much more convenient than it would be were it to remain in Nevada. Although representation of Mrs. Livolsi could be carried out through local counsel in the District of Nevada, there is an inherent inconvenience to such a situation, especially given the need to confer with a client in such a frail state. As noted in section 6 above

the government's counsel would not be nearly as burdened by transfer of venue, while Mrs. Livolsi's ability to participate with her counsel in her own defense would be significantly diminished in the absence of a transfer.

7. *Relative accessibility of the forum.*

As stated above, the U.S. Attorney's office in the Northern District of Oklahoma is a mere two blocks from the federal courthouse in Tulsa. It is also geographically closer for witnesses who might arrive from the eastern states. However, on other points of accessibility, Las Vegas and Tulsa both have international airports, commutes of only a few minutes from their airports to their federal courthouses and, no doubt, comparable facilities available for federal prosecutors. As neither forum seems dramatically inaccessible, this factor neither favors nor disfavors transfer.

8. *Relative Docket Burden*

By almost any relevant metric available, the load of the criminal docket of the Northern District of Oklahoma is considerably more accommodating than that of the District of Nevada. As of the 2011 annual report of the Administrative Office of the United States Courts on federal judicial business (the most recent data available), Nevada handled 555 criminal filings in 2011 to the 188 of the Northern District of Oklahoma. Judicial Business of the United States Courts: 2011 Annual Report of Director Honorable Thomas F. Hogan at Table D. Furthermore, the median time between filing and disposition of a criminal case—be it by dismissal, guilty plea, bench trial or jury trial—is roughly a third less in the Northern District of Oklahoma than in the District of Nevada. *Id.* at Table D-6. Thus, the Northern District courthouse and its docket could easily accommodate a trial on two counts against a single defendant.

9. *"Special elements" affecting transfer*

Finally, as suggested repeatedly due to its inexorable comingling with the other *Platt* factors, Mrs. Livolsi health is in a dire state. She currently suffers from the effects of chemotherapy to treat leukemia, as well as severe lupus, chronic bronchitis, and a bacteria infection in her blood. Furthermore, she will soon undergo radiation treatment to eradicate her thyroid gland, a procedure that will require her to be quarantined due to the dangerous level of radiation emitted by her body. Clearly, a trial even in the state of her residence would be a daunting experience.

There are few cases in the Ninth Circuit dealing with a health-related "special element" factor contemplated in the *Platt* decision; however, it has been a highly significant factor in cases in other districts. *See e.g.*, *Lopez*, 2002 WL 31498984 (a quadriplegic defendant was allowed transfer from Kansas to Arizona, where he resided). Additionally, courts have recognized that they cannot order a patient to be well in order to stand trial. *United States v. Liska*, 1995 WL 704775 at * 6 (N.D. Ill. 1995)* 6 (in granting a motion to transfer, the court stated it did not believe it had the power to order a defendant to have a corrective surgery that might allow him to stand trial). While a sampling of cases in which a motion to transfer was partially predicated on a defendant's ill-health, many of the published cases focus on much more manageable issues than Mrs. Livolsi's myriad ailments and barrage of radiation and other painful and debilitating treatments. *See United States v. West Coast News Co.*, 216 F. Supp. 911 (W.D. Mich 1963) (denial of motion partially based on defendant's "heart occlusion"), *United States v. Ashland Oil, Inc.*, 457 F. Supp 661 (W.D. Ky. 1978) (denial of motion partially based on defendant's hypertension). However, in cases in which the health issue burdened the defendant with a level of dependency on others and/or medical facilities and specialists comparable to Mrs. Livolsi's such transfers have been granted. *See e.g.*, *Liska*, 1995 WL 704775 at * 3.

*CONCLUSION*

It is clearly in the interest of justice that Mrs. Livolsi be afforded a jury trial on the above-mentioned allegations in the forum where she and her family have lived for years, including at all times concurrent with the allegations in the Indictment (dkt. #1), and where she currently fights for her life with the aid of medical facilities located in the heart of the Northern District of Oklahoma. The defendant could literally be harmed by a trial in the current venue. Thus far, the government has not indicated they will utilize any evidence that cannot quickly and easily be moved to this forum, nor any reason why their witnesses could not travel from Maryland to the Northern District of Oklahoma, rather than Nevada, to testify with relative ease and little if any additional hardship. Finally, a transfer would require no disruption of action and no severance of either claims or defendants. Therefore, for all the above reasons, this Court should exercise its discretion and allow transfer of this trial to the Northern District of Oklahoma.

Dated: The 25th day of July, 2012.

Respectfully submitted,

*/s/* Scott A. Graham
OK Bar No.: 19817; *Pro Hac Vice*
GRAHAM, ALLEN & BROWN, PLLC.
427 S. Boston Ave., Ste. 355
Tulsa, OK 74103
T: 918.948.6171
F: 800.460.3446
scott@lawtulsa.com

---

[1] Fed. R. Crim. P. 21(b) provides, "For Convenience.  Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."